IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN D. PAOLI, | ) |
| Plaintiff, | ) |
| | ) No. 16-cv-11072 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| ROBERT WILKIE, Secretary, | ) |
| United States Department of Veterans Affairs,[1] | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff John D. Paoli is an officer at Hines VA Medical Center ("Hines VAMC") who has a history of filing Equal Employment Opportunity ("EEO") and Merit Systems Protection Board ("MSPB") complaints. In 2014, he interviewed twice for a promotion but was denied both times. Paoli has now brought this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, against Robert Wilkie, in his official capacity as Secretary of the United States Department of Veterans Affairs (the "VA"), alleging that he was denied a promotion in retaliation for his protected activity of filing EEO and MSPB complaints. Before the Court is the VA's motion for summary judgment. (Dkt. No. 24.) For the foregoing reasons, the VA's motion is denied.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Robert Wilkie, Secretary, United States Department of Veterans Affairs, has been substituted as Defendant in place of Robert A. McDonald, who no longer holds that position.

# BACKGROUND[2]

Paoli has worked as a police officer at the Hines VAMC in Hines, Illinois since 2009. (Pl.'s Resp. to Def.'s Statement of Material Facts ("RSMF") ¶¶ 1–2, Dkt. No. 26.) His position is classified as GS-6 on the federal general schedule pay scale. (*Id.* ¶ 2.)

From May 2012 to March 2013, Steve Thurman was the acting Chief of Police at Hines VAMC. (Def.'s Resp. to Pl.'s Statement of Additional Facts ("RSAF") ¶¶ 1, 10, Dkt. No. 36.) At the beginning of his tenure as acting Chief of Police, Thurman took the position that "there were numerous issues concerning the suitability of police officers at the Hines VAMC." (*Id.* ¶ 2.) Thus, Hines called an "all hands meeting" of police officers. During that meeting, he warned the officers that he had a list of people that filed EEO complaints and that they would be "identified and dealt with." (*Id.* ¶¶ 5, 39–40; Pl.'s Statement of Additional Facts in Opp'n to Summ. J. ("SAF"), Ex. 65 at 11:15–12:7, Dkt. No. 30-2.)

Around that time, Thurman directed the Assistant Chief of Police at Hines VAMC to put together a list of officers who had filed an EEO complaint and returned to service following the disposition of the complaint. (RSAF ¶¶ 6–8; SAF, Ex. 52, Dkt. No. 30-1; SAF, Ex. 65 at 16:6–18:21; SAF, Ex. 66 at 39:9–40:2, Dkt. No. 30-2.) Paoli was one of the officers on that list. (RSAF ¶ 8; SAF, Exs. 51–52.) Thurman would later evince his anti-EEO animus when he stated in deposition testimony his belief that EEO complainants used the process as "an ATM in the past." (RSAF ¶ 4.) He also noted that the majority of people terminated or recommended for termination from Hines VAMC had EEO complaints. (*Id.*)

---

[2] Paoli and the VA have numerous factual disputes. For purposes of summary judgment, where facts are disputed, those facts are viewed in the light most favorable to Paoli as the non-moving party. *See Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550 (7th Cir. 2017). Thus, the facts recounted here are either undisputed or reflect Paoli's version of the facts when those facts are supported by admissible evidence.

In March 2013, Gary Marsh was appointed as Hines VAMC's Chief of Police. (RSAF ¶ 10.) Shortly after his appointment, Marsh heard rumors of a "hit list" identifying officers who had filed EEO complaints. (*Id.* ¶ 10; SAF, Ex. 68 at 31:10–32:7, Dkt. No. 31-1.) During his deposition, Marsh testified that Thurman confirmed to him in 2015 that he kept a list of officers who had filed an EEO complaint, but denied that it was a "hit list" to get even with the people who filed complaints. (SAF, Ex. 68 at 36:15–37:6.) Rather, Thurman said he kept the list only to see if the issues could be resolved at the individual level before being escalated. (*Id.*) Marsh did acknowledge in his testimony that none of the officers on the list have ever been promoted. (RSAF ¶ 10; SAF, Ex. 68 at 45:17–22.) Nonetheless, he did not further investigate whether that list was used for a retaliatory purpose, explaining that he did not "believe it was under [his] purview to go back to past history and try to investigate it." (RSAF ¶ 10.)

Prior to applying for the promotion at issue here, Paoli had filed three EEO or MSPB complaints over the course of his career at Hines VAMC. (RSMF ¶ 3.) Paoli filed his first EEO complaint on July 28, 2010, after he was terminated during his probationary period.[3] (RSAF ¶¶ 15–16.) His complaint alleged that he was terminated in retaliation for reporting misconduct by Officer Cary Kolbe. (*Id.* ¶¶ 16–17.) On December 21, 2011, Paoli was reinstated to his former position as a police officer. (*Id.* ¶ 19.) Paoli subsequently filed another EEO complaint on March 5, 2013, this time alleging racial discrimination, a hostile work environment, and retaliation. (*Id.* ¶ 24.) That complaint related to an email Paoli sent to then-acting Chief Thurman, Assistant Police Chief James Runge, and Hines VAMC's Director stating that his superior, Lieutenant

---

[3] An officer's probationary period consists of the one-year period following the officer's appointment date. It "is a final step in the examination process, which provides the test of actual performance on the job." During the probationary period, "whenever work performance or conduct fails to demonstrate fitness or qualifications for continued federal employment, action to discharge the employee is required." (SAF, Ex. 2, Dkt. No. 28-1.)

Guajardo, instructed Paoli and another officer to escort a highly-intoxicated veteran off Hines VAMC grounds without regard to the veteran's welfare or safety. (*Id.* ¶ 22.) In addition, Paoli filed a complaint about a prohibited personnel practice with the Office of Special Counsel on January 15, 2013. The complaint alleged that Paoli was retaliated against for reporting Guajardo's conduct when Paoli was accused by Thurman of violating the chain of command in the manner that he reported Guajardo's conduct, falsely accused of assaulting Guajardo, and detailed from police service to non-police administrative duties. (*Id.* ¶ 25; SAF, Ex. 20, Dkt. No. 29-1.) Paoli was issued a notice of removal on March 13, 2013, but the removal was reduced to a 14-day suspension on June 27, 2013. (RSAF ¶¶ 26–27.) Paoli appealed that suspension to the MSPB, and his suspension was ultimately rescinded. (*Id.* ¶¶ 28–31.)

The events giving rise to the present action began in May 2014, when Paoli applied for a Lead Police Officer opening. (RSMF ¶ 4.) The Lead Police Officer position was classified at GS-7, which is a higher paygrade than Paoli's GS-6. (*Id.*) The announcement for the position stated that "This job opportunity announcement may be used to fill additional vacancies." (RSAF ¶ 32.) Paoli was one of eight candidates who interviewed for the position on November 6, 2014. (RSMF ¶ 5.) All eight candidates were asked by an interview panel the same set of "performance-based" questions, which focused on the candidate's experience and how he or she reacted to work situations in the past. (*Id.* ¶ 6.) The interview panel consisted of four members, and each panelist separately rated each candidate's response to each of the questions on a one-to-five scale. (*Id.* ¶ 7.) There were eight questions and four panelists. Thus, a candidate could get a maximum score of 40 from an individual panelist and a maximum combined score of 160. (*Id.*) Of the candidates, Paoli received the second highest combined score of 124. Moreover, the only panelist who was aware of Paoli's EEO activity gave him 37 points, which made him the highest scoring candidate

4

for that panelist. (*Id.* ¶ 8.) All panelists denied that any retaliatory motive influenced their score of Paoli. (*Id.* ¶¶ 8–9.) Marsh was ultimately tasked with making the final hiring decision, and based on the interview panel's ratings he offered the position to the candidate who received the highest combined score from the panel. (*Id.* ¶ 10.) That decision was made on November 12, 2014. (RSAF ¶ 33.)

Meanwhile, there was a second Lead Police Officer position that was open on November 12. (*Id.*) Indeed, that position became available in September 2014. (*Id.*) At the same time, the promotion certificate[4] containing the names of the best qualified candidates for the first Lead Police Officer position remained valid. (SAF, Ex. 43 at 11, Dkt. No. 29-2; SAF Ex. 54, Dkt. No. 30-1.) That promotion certificate was first issued in June 2014. (SAF, Ex. 54.) While it was cancelled due to inactivity in October 2014, the vacancy was subsequently restored and the promotion certificate was reissued that same month. (RSAF ¶¶ 32–33, SAF, Ex. 54, Dkt. No. 30-1.) And Hines VAMC's policy stated that once a promotion certificate has been issued, another promotion certificate for the same vacancy will not be issued for six months unless fewer than three high-quality candidates from the original applicant pool remain. (RSAF ¶ 34.) Otherwise, a selection must be made from the pool resulting from that promotion certificate if it is filled by competitive promotion during that sixth-month period. (*Id.*) Marsh later testified that he intended to select Paoli from the promotion certificate issued for the first Lead Police Officer position to fill the second vacancy. (*Id.* ¶ 35.) Yet, Human Resources told Marsh that he was unable to do so because the promotion certificate had expired. (*Id.*; SAF, Ex. 68 at 62:18–63:18.) However, a

---

[4] Human Resources has the initial responsibility for determining whether candidates possess the qualifications for a promotion. Normally a promotion certificate is then prepared by a promotion panel that rates and ranks all qualified candidates. Where, as here, there are ten or fewer qualified candidates available, the promotion panel is bypassed and all qualified candidates are certified without a rating or ranking. (SAF, Ex. 43 at 9–11.)

Hines VAMC Human Resources employee later stated that there was no expiration date on the vacancy announcement after it was restored in October 2014. (RSAF ¶ 36.)

Instead of selecting from the first promotion certificate to fill the second Lead Police Officer position, a second notice of vacancy was published on December 8, 2014.[5] (*Id.* ¶ 37.) Paoli again applied for the opening and was interviewed along with six other applicants on January 30, 2015. (RSMF ¶ 12; RSAF ¶ 37.) According to Paoli, this process was tainted by the negative influence of Kolbe, with whom he had a tense relationship. Indeed, Paoli's first EEO complaint reflected numerous negative interactions with Kolbe and contained a request that Kolbe be removed as a police officer. (SAF, Ex. 1, Dkt. No. 28-1.) Moreover, in connection with the investigation of that complaint, Paoli told an EEO Investigator that he had previously reported Kolbe for sexually harassing a Hines VAMC employee. (RSAF ¶ 17.)

The second interview was conducted in the same manner as the first interview. (RSMF ¶ 12.) The interview panel consisted of three panelists, two of whom were unaware of Paoli's EEO activity. (*Id.* ¶ 16.) While the third panelist testified that he was unaware of Paoli's EEO activity, Paoli contends that the panelist was friends with Kolbe and therefore gave Paoli poor scores and favored a different individual due to Kolbe's influence. (*Id.* ¶¶ 16, 18.) All three panelists have denied that their scores were influenced by any retaliatory motive. (*Id.* 16.) Once again, Paoli did not receive the highest score from the interview panel. (*Id.* ¶ 15.) The panelist who was allegedly friends with Kolbe gave Paoli a score of 25 out of 40, and the other panelists gave him scores of 28 and 29 for a total of 82. (SAF, Ex. 49, Dkt. No. 30-1.) Two other candidates for the position tied for the highest score at 105. (*Id.*) Those two individuals had previously interviewed for the first Lead Police Officer opening, both scoring well behind Paoli;

---

[5] This announcement was for two vacancies, as the individual selected for the first Lead Police Officer position ended up leaving the police force. (SAF, Ex. 68 at 73:2–74:11.)

one received the lowest interview score for that position and the other had the fourth lowest score. (RSAF ¶ 37.) Nonetheless, Marsh selected those individuals for the opening over Paoli based on their interview scores from the second round of interviews. (RSMF ¶ 17.) Marsh testified that neither of his final promotion decisions was influenced by retaliatory motive. (*Id.* ¶¶ 10, 17.)

## DISCUSSION

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). For Title VII retaliation claims to survive summary judgment, a plaintiff must offer evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (internal quotation marks omitted).[6]

The VA does not dispute that Paoli satisfies the first two elements of a retaliation claim: Paoli engaged in a statutorily protected activity and his denial of the promotion to Lead Police Officer was a materially adverse action. However, the VA disputes whether a jury could find a causal connection between the failure to promote and Paoli's statutorily-protected activity. To demonstrate causation, Paoli must show that "the desire to retaliate was the but-for cause of the challenged employment action." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016). Causation may be shown through direct evidence "such as an admission by the employer

---

[6] A plaintiff may also prove his claim by using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). However, Paoli does not employ this burden-shifting framework in opposing summary judgment and, in any case, fails to satisfy his burden to set forth a *prima facie* case under that framework.

of unlawful animus." *Baines*, 863 F.3d at 661. Since such evidence is rare, a "plaintiff may also supply the causal link through circumstantial evidence from which a jury may infer intentional discrimination." *Id.* (internal quotation marks omitted). Whether direct or circumstantial, the evidence taken together must show that it is more likely than not that a retaliatory motive was behind the adverse action. *See id.* at 661–62; *see also Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 ("Evidence must be considered as a whole . . . .").

The undisputed evidence indicates that Paoli had three different opportunities to be promoted to a Lead Police Officer position. His first opportunity came when he interviewed for the first vacancy. However, his interview scores put him behind another candidate, who was ultimately chosen for the promotion. Paoli does not allege that this instance of non-promotion was retaliatory. Yet, on the day that the first vacancy was filled, there was a second Lead Police Officer vacancy that remained open. Paoli claims that he was retaliated against when the VA opted to post a new notice of vacancy in contravention of the VA's own policy rather than selecting him from the first promotion certificate to fill the second vacancy based on his second-place score. Instead, Paoli had to interview again for the position. According to Paoli, that second interview was rigged against him due to his past protected activity.

The Court views the present matter as alleging two related but separate instances of retaliatory non-promotion. Turning first to the failure to promote Paoli after the second interview, the three individuals comprising the interview panel for the second vacancy all denied being aware of Paoli's past protected activity. But Paoli claims that one member of the panel had a social relationship with Cary Kolbe, which negatively influenced that panelist's assessment of Paoli, and further that because Kolbe had a retaliatory animus toward Paoli due to Paoli naming him in an EEO complaint, Kolbe's intent should be imputed to that panelist. *Boston v. U.S. Steel*

8

*Corp.*, 816 F.3d 455, 465 (7th Cir. 2016) ("[C]ourts have imputed the retaliatory intent of a subordinate to an employer in situations where the subordinate exerts significant influence over the employment decision.").

Paoli's claims about Kolbe's influence run into two problems. Most fundamentally, Paoli offers no admissible evidence to support these claims. He points to deposition testimony from a lieutenant stating that Kolbe went to great lengths to make sure his friend had an unfair advantage in the interview process. Yet, that testimony was not within the deponent's personal knowledge. Instead it was purely speculation as to Kolbe's intention. *See Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) ("[A]lthough personal knowledge may include reasonable inferences, those inferences must be grounded in observation or other first-hand experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." (internal quotation marks omitted)). For example, the lieutenant stated, "[Kolbe is] going to make sure [the favored candidate] is taken care of. It has been rumored that he will." (RSAF, Ex. 65 at 27:17–18.) And when asked whether Kolbe had influence over the panel, the lieutenant responded, "I'm pretty sure he did." (*Id.* at 31:19–21.) Yet, even accepting Paoli's allegations regarding Kolbe's influence as true, Paoli does not deny that the other panelists were unaware of his EEO activity nor does he set forth admissible evidence of their bias. And the allegedly biased panelist's score was not determinative. That panelist gave Paoli a score of 25. The other two panelists' combined score for Paoli was 57. Had the "biased" panelist given Paoli a perfect score of 40, Paoli's total score still would have been 97. The individuals who were ultimately promoted had scores of 105. Marsh made his decision based solely on interview scores. Thus, Paoli still would have been denied the promotion even absent bias.

9

In addition, Paoli tries to impeach the neutrality of the interview scores by citing a lieutenant's testimony stating that he heard from another officer that panelists were told to sign score sheets without entering their scores because that would be taken care of later. (*Id.* at 45:5–49:13.) This testimony would be inadmissible at trial because it is double hearsay.[7] Moreover, there appears to be no way for this evidentiary deficiency to be cured and the evidence presented in a reliable non-hearsay fashion.[8] Consequently, this testimony cannot be considered on summary judgment.

In short, there is no admissible evidence from which a reasonable jury could conclude that Paoli was subject to a biased panel for the second interview. Paoli did not receive a qualifying score following that round of interviews. Then, the ultimate decisionmaker, Marsh, selected the candidates with the highest interview scores for the promotion. Based on the admissible evidence adduced at summary judgment, there is no genuine issue for trial concerning the second round of interviews.

Nonetheless, there remains the issue of whether the VA retaliated against Paoli by making him interview for the second Lead Police Officer vacancy instead of selecting him from the promotion certificate issued for the first Lead Police Officer vacancy on the basis of his second-place interview score for that position. The cancellation and subsequent re-listing of a vacancy for

---

[7] Neither layer qualifies as non-hearsay under Rule 801(d)(2)(D), which excludes from the rule against hearsay a statement that is "offered against a party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." For a statement to come into evidence under that rule, the employee making the statement must have duties that "encompass some responsibility related to the decisionmaking process affecting the employment action." *Stephens v. Erickson*, 569 F.3d 779, 793 (7th Cir. 2009) (internal quotation marks omitted). Here, the lieutenant could not definitively recall who made the first-layer statement to him. He said it was likely one particular officer, but there is no evidence that that officer had any duties related to the promotion process. As to the second-layer statement, there is no evidence showing that the testifying lieutenant had any role in the promotion process.

[8] Even if the maker of the first-layer statement could be identified as someone who had decisionmaking responsibilities, the second-layer testimony, in substance, conveys nothing more than unreliable gossip. (*See, e.g.*, RSAF, Ex. 65 at 48:23–49:2 ("Q. Is it possible Mr. Henderson was describing what he heard from another third-person? Possibly, or he could have saw it himself.").)

which an applicant interviewed may constitute an adverse employment action. *See, e.g.*, *Davis v. Ashcroft*, No. 00-584(WGB), 2002 WL 1065686, at *9 n.18 (D.N.J. Mar. 8, 2002) ("[T]he Court can imagine . . . instances where an employer, confronted with a qualified applicant from a protected class, might impermissibly re-announce the position solely to justify not hiring a protected applicant."); *Terry v. Gallegos*, 926 F. Supp. 679 (W.D. Tenn. 1996). While the VA does not contest that this is the case, the Court nonetheless is satisfied that the circumstances of the re-announcement of the vacancy here create a genuine issue of material fact as to whether a new notice of vacancy was announced to avoid hiring Paoli. The second Lead Police Officer position was vacant at the time Paoli interviewed for the first position. Both positions were identical in terms of duties and compensation. Paoli had the second highest score after the first round of interviews, and after the highest scoring applicant was selected for the first opening, Paoli was next in line to fill the second position. Moreover, Hines VAMC's policies arguably require[9] that the second vacancy be filled by one of the candidates from the promotion certificate issued for the first vacancy. Indeed, Marsh wanted to select Paoli. Given these circumstances, a jury could conclude that Paoli was subject to an adverse employment action when the vacancy was re-listed.

The VA contends there is no causal relationship between Paoli's non-promotion and his protected activity because the promotion certificate had expired and the VA could not select from

---

[9] The Court need not, for present purposes, conclude that the Hines VAMC policy definitively required that Paoli be selected for the second vacancy. The policy states that "[o]nce a final properly constructed Promotion Certificate resulting from the original announcement has been issued, another merit Promotion Certificate for the ***same vacancy*** will not be issued for six (6) months unless fewer than three (3) 'high quality' candidates remain." (RSAF, Ex. 43 (emphasis added).) That language could be interpreted to mean that the policy does not apply here because the second Lead Police Officer position is a different vacancy from the first Lead Police Officer position. On the other hand, the announcement for the first Lead Police Officer position stated that the announcement may be used to fill other vacancies. At this stage, the Court simply finds that the evidence creates a jury issue as to whether Hines VAMC policy was violated when Paoli was not selected from the first promotion certificate to fill the second vacancy.

it. In order to establish a causal connection between the re-announcement and his protected activity, Paoli must first establish that this explanation was pretextual. *See Burton v. Bd. of Regents of Univ. of Wisc. Sys.*, 851 F.3d 690, 697 (7th Cir. 2017). Here, there is evidence controverting the VA's assertion that the first promotion certificate had expired. For instance, a Hines VAMC Human Resources supervisor stated that there was no expiration date on the vacancy announcement, which indicates that the promotion certificate was still valid on November 12 when Marsh made the first Lead Police Officer promotion. (SAF Ex. 54; *see also* SAF Ex. 44, Dkt. No. 30-1.) A jury could conclude from the evidence that the re-listing of the second Lead Police Officer vacancy was pretext to avoid hiring Paoli. *See Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 785 (7th Cir. 2005) ("[An employee] can establish pretext by demonstrating that [the employer's] explanation for the firing was either dishonest or patently inconsistent with the evidence before the court." (internal quotation marks omitted)). Furthermore, a jury may also "consider that pretextual explanation as evidence of retaliatory motive." *Gracia*, 842 F.3d at 1021.

The fact that a new notice of vacancy was posted despite an existing, valid promotion certificate also provides evidence of the VA's retaliatory intent, as a reasonable jury could conclude that the VA deviated from Hines VAMC's policy requiring selection from a valid promotion certificate to fill the same vacancy. *Baines*, 863 F.3d at 664 ("An employer's unusual deviation from standard procedures can serve as circumstantial evidence of discrimination."). This policy deviation is all the more suspicious because the decisionmaker, Marsh, wanted to hire Paoli based on his qualifying first interview score. Yet, he was overridden by Human Resources for a reason that could be deemed pretextual.

Finally, Paoli sets forth evidence that would allow a reasonable jury to conclude that there was a general animosity amongst Hines VAMC management toward individuals that filed EEO complaints. Indeed, in the past, a majority of officers terminated or recommended for termination had engaged in EEO activity. And while he was serving as acting Chief of Police, Thurman made statements that would tend to discourage officers from engaging in statutorily protected activity. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) (finding that "behavior toward or comments directed at other employees in the protected group" is circumstantial evidence of retaliation); *see also Poullard v. McDonald*, 829 F.3d 844, 857 (7th Cir. 2016) ("[A]n unfulfilled threat of discipline for protected activity, if not actionable itself, may well be relevant evidence of retaliatory intent behind a more concrete adverse action."). Specifically, he warned the officers that he had compiled a list of individuals who had filed EEO complaints and warned them that they would be "dealt with." Moreover, the uncontroverted evidence shows that such a list did exist and it included Paoli. Combined with the fact that Marsh actually wanted hire Paoli but was overridden, the evidence creates a jury issue as to whether management's animus infected the promotion process.

## CONCLUSION

For the foregoing reasons, the VA's motion for summary judgment (Dkt. No. 24) is DENIED. The Court concludes that there is a triable issue of material fact as to whether the second Lead Police Officer position was re-listed in an attempt to deny Paoli a promotion he otherwise would have received in retaliation for his protected activity. Consequently, summary judgment is not appropriate as to Paoli's claim based on that adverse employment action. However, there is no genuine issue of material fact concerning the VA's failure to promote Paoli

following his interview for the re-listed second vacancy. Paoli may not pursue his claim based on that alleged adverse act at trial.

Dated: September 26, 2018

ENTERED:

_____
Andrea R. Wood
United States District Judge